McConnell *v.* American Bronze Powder Manufacturing Co.

MILTON McCONNELL

*v.*

THE AMERICAN BRONZE POWDER MANUFACTURING COMPANY.

1. After a mill owner has acquired, by prescription, an easement of flowage, no cessation in the use of it will extinguish it unless the cessation be continued uninterruptedly for the full period of twenty years, or the cessation be commenced or continued under such circumstances as to evince unmistakably an intention by the mill owner to abandon his right, and as shall also render a subsequent resumption of it by him clearly inequitable to the owner of the servient tenement.

2. A dam can only produce its full effect on the stream above when the pond is full, and therefore the evidence of witnesses, in a flowage suit, who attempt to give the usual state of the water in the pond or in the stream above from observation, but who have made their observations without knowing, at the time they were made, whether the pond was full or not, is entitled to very little consideration.

On final hearing on bill and answer, and proofs taken in open court.

*Mr. Joseph Coult,* for complainant.

*Mr. Louis Hood* and *Mr. Frederick W. Stevens,* for defendants.

VAN FLEET, V. C.

The object of this suit is to compel the defendants to lower their dam.    The complainant owns a farm in the township of

Caldwell, in the county of Essex, lying on both sides of a small stream called Peckman river. The course of this stream through the complainant's farm is from south to north, its waters flowing in a northerly direction. The defendants own a tract of land adjoining the complainant's farm on the north, on which there is a mill run by water, the power for which is supplied by a dam across this stream. This dam has been in existence for over seventy years. The right of the defendants to maintain a dam on this stream is not disputed, nor is it denied that the dam maintained there was, up to the fall of 1876, a lawful structure. But the complainant says that the defendants raised the dam above its lawful height in the fall of 1876 and again in 1881 or 1882, and that the two additions thus made increased its height forty-two inches beyond the elevation at which they had a right to maintain it. The complainant brought an action at law against the defendants in May, 1883, which was tried in September of the same year, and resulted in a judgment in favor of the complainant for substantial damages. The complainant afterwards, on the 28th of April, 1884, filed his bill in this court, praying that the defendants might be decreed "to reduce the dam to its original height as it was prior to 1876." The defendants, on the 10th of May following, and before they answered, reduced the dam five inches and seven-eighths of an inch, and then answered, alleging that the dam, as thus reduced, is a lawful structure, and that its height is now no greater than of right it should be. The complainant contends, however, that the dam is still too high, and he has brought his suit to final hearing for the purpose of having the question determined whether the dam, in its present reduced condition, is not higher than the defendants have a right to maintain it. He insists that it is, and that his lands are, in consequence, at all times, inundated with water from the defendant's pond to a greater extent than they ever were before.

The question presented for judgment requires the court to fix the height at which a dam might rightfully be maintained, at the place in question, prior to 1876. The structures existing prior to 1876 are admitted, at least impliedly, to have been law-

ful, for it is the addition which the defendants made to the lawful height in the fall of 1876 that the complainant states as the foundation of his action, and it is only the excess above such height that he has a right to ask to have reduced. So that the test to be applied to the present structure is, Is the dam, as now reduced, above the height at which the defendants have a right to maintain a dam on this stream? And their right in this regard is not to be measured by the height of the structure which immediately preceded the dam built by the defendants, unless such previous structure had stood there, at the same elevation, for the full period of twenty years immediately before the fall of 1876. The previous dam may have been below the elevation at which the mill owner had a right to maintain it; if so, and it had not been kept at such reduced height for the period of twenty years, or, the mill owner, in making the reduction, did not do it under such circumstances as to conclusively evince a plain and deliberate intention to abandon all right to the excess above such reduced height, and thereby induced the owner of the servient tenement to do something which, but for the manifestation of such intention, he would not have done, he would still have a right to raise his dam to its original elevation. In other words, the settled rule on this subject may be stated as follows: after a mill owner has acquired, by prescription, an easement of flowage, no cessation in the use of it will extinguish it, unless the cessation be continued uninterruptedly for the full period of twenty years, or the cessation be commenced or continued under such circumstances as to evince, unmistakably, an intention by the mill owner to abandon the right, and as shall also render a subsequent resumption of it by him clearly inequitable to the owner of the servient tenement. *Cooper* v. *Carlisle, 4 C. E. Gr. 256; S. C. on appeal, 6 C. E. Gr. 576.*

The evidence on the part of the defendants gives what I think may be safely regarded as a trustworthy history of the several dams which have existed at the point in question since about 1845. A witness, who now owns a mill located on the same stream, about a mile and a half below that of the defendants, and whose recollection of the several dams which, during the

period intervening since 1846, have existed at the mill now owned by the defendants, seems clearer and more perfect than that of any other witness who has given evidence upon that subject, describes the dam existing there in 1846 as follows: the westerly end of the dam, he says, consisted of a stone bulkhead, higher than any other part of the dam, about thirty feet in length; next came a set of floodgates, covering, in their united length, a space of about ten feet; next to them stood a stone buttress twelve or fifteen feet in length, and then came another set of floodgates, greater in length than the first set, and lastly, a dam constructed of stone, with earth placed in front of it, extending far enough to the east to strike the natural grade of the earth east of the pond. On the top of this stone dam last mentioned, the witness says, pieces of timber, round saplings, were laid, which were held in position by other pieces of timber, standing upright, mortised at the top and imbedded in the stones of the dam so that the timbers lying on the dam rested in the mortises of the uprights, and were thus held firmly, and made perfectly secure. These pieces of timber lying on the top of the dam constituted, the witness says, the lip of the dam, and marked the efficient height of the dam. When the pond was full the first water which escaped from it flowed over this lip, and this part of the dam constituted what mill owners call the overflow or tumble of the dam. But he also says that while this part of the dam was the lowest, and furnished the first means of escape for the water when the pond was full, it was never used as a waste-way or outlet in times of flood, but that at such times the floodgates were hoisted, and the surplus water discharged through them. This description of the dam of 1846 is admitted by all the witnesses who claim to have any knowledge respecting it to be in the main correct. Others testify to a widely different recollection as to the height of this part of the dam, when compared with certain other parts, from that sworn to by this witness, but, in other respects they, with entire uniformity, agree to the general accuracy of his description.

The dam of 1846 remained unchanged until 1860, then one set of floodgates went out, and were replaced the same year.

After this, no further change occurred until 1866 or 1868—the witnesses differ as to the year, but I think the weight of the evidence shows the year to have been 1868—then the whole central part of the dam, consisting of the two sets of floodgates and the stone buttress, was carried away, leaving the bulkhead on the west and the stone dam on the east still standing. They remained substantially in the same condition in which they were in 1846. The central part of the dam was replaced the same year, but it was constructed in a different manner, and to some extent of different material from its predecessor. It was made principally of wood, and without floodgates. The person who built it swears that when he quit work on it, it was from four to six inches lower than the lip of the eastern part of the dam, and that its height was never subsequently increased, except temporarily by placing planks or boards on it, which were afterwards taken off. No further change was made in the dam after this until August, 1875, then the central part of it was again carried away, but its two extremities, which had withstood the previous floods, also withstood that of 1875. They remained intact. The dam remained in this broken condition until the fall of 1876. The central part of it was then restored and raised above the lip of the eastern part of the dam about six inches. Other changes were made at the same time. The proofs make it entirely certain that a part of the lip of the eastern part of the dam, being the piece of timber lying farthest west, and next to that part of the dam which had been repeatedly washed away, still remained in the fall of 1876, and also as late as September, 1883, in its place, intact and unchanged.

Now, although the only fact stated in the complainant's bill, as his ground of action, is that the defendants, in 1876, and subsequently, raised their dam above its lawful height, and thereby caused the water of their pond to flow back upon his lands, to his injury, yet he did not, in attempting to establish his case in the first instance, offer a word of testimony tending to show directly that the dam erected in 1876 was higher than the dam which had existed there from 1846 to 1868. He made no effort whatever, in the first instance, by direct testimony, to show either

the height of the dam of 1846, or of any previous or subsequent dam, or how any such previous dam compared in height with the dam of 1876. The proofs he offered to establish his case consist entirely of the recollection of witnesses, as to the difference in the quantity of water found at certain points along the pond and in the stream above the pond since 1876, as compared with the quantity found at these several points at various dates prior to 1876. His purpose being, by this sort of proof, to demonstrate that the quantity found at these places since 1876, when the waters of the stream were unaffected by exceptional conditions of the weather, and in their ordinary state, has been greater than it was previous to that year, and thus establish, by inference, that the dam must have been higher since 1876 than it was before.

His proofs of this description were mainly directed to five different localities, viz.: first, a ford about twelve hundred feet south of the dam, and used by the complainant to go from his land on the west side of the stream to his land on the east side; second, the northeast corner of the complainant's meadow on the west side of the pond and adjacent to the mill property of the defendants; third, two rocks on the west side of the pond, standing in the pond, on land of the defendants; fourth, two small runs or guts on the east side of the pond, which some of the witnesses have called slanks; and, fifth, the east shore of the pond. Under the view I take of this evidence, no synopsis of it need to be given. Without entering into details, I think this may be stated as its fair result: that a large majority of the complainant's witnesses agree that, as they compare the quantity of water which they found at such of these places as they have recently examined, with the quantity which existed there in years past, according to their present recollection—and some of the comparisons which have been attempted to be made were between the state of the water as far back as 1810, and its state in 1883 and 1884—they believe that the quantity is greater now than it was prior to 1876, some of them declaring that the difference in quantity is so great as to leave no doubt on their minds that the capacity of the pond has been very greatly increased. But the

value of these opinions as evidence is very greatly impaired, according to my judgment, by the fact that the witnesses who utter them differ very widely, in material respects, among themselves. For example, several of them fix the southerly line of the pond—the point where the natural flow of the stream ceased or the motion of its waters became so slight as to be imperceptible, prior to 1876, when the stream was in its ordinary state—as thirty or forty feet below or north of the complainant's ford, while others put it within six, eight and ten feet of the ford, and one just on the lower side of the pond; and another says that when the pond was full the water of the pond flowed back on the ford; and still another says that when the pond was full its waters flowed back over the ford and beyond it. This great discordance renders one thing tolerably certain : either that the condition of this stream, when unaffected by exceptional or accidental causes, is subject to great variation, or otherwise these witnesses have adopted widely different standards for determining when its waters are in their ordinary and usual state.

There can be no doubt that the whole value of this evidence, so far as it can have any effect in demonstrating how the dam affected the stream above it, depends entirely on the fact whether, at the time these witnesses made the observations by which they fix the southerly line of the pond as being below the ford, the pond was full or not; for it is perfectly manifest that it is simply impossible for any person to ascertain, by mere observation, how far a dam will cause the water of the stream on which it is placed to flow back, or at what point, above the dam, the dam will impede the natural flow of the stream, unless such observation is made when the pond is full. It is only when the pond is full that the dam produces its full effect, and shows how far up stream it will impede the natural flow of the stream. If the dam is a lawful structure, the usual or ordinary condition of the stream, above the dam, is that, and that only, which exists when the pond is full and the stream is unaffected by exceptional or accidental causes. Now, although these are familiar truths, about which there can be no dispute, yet it appears that all of the complainant's witnesses, speaking to this point, except the last two, state

that they are unable to say, from personal knowledge, what was the condition of the water at the dam, whether it was flowing over the dam, or stood below it, when they made the observations which induce them to fix the southerly limit of the pond, prior to 1876, as being anywhere from the lower side of the ford to forty feet below it. Hence, if it be conceded that the observations of these witnesses were carefully made, under such circumstances as were likely to impress what they saw very firmly upon their memories, and that their recollection of what they then saw is still, notwithstanding the lapse of many years, fresh and strong, still, I think, it is very clear that it would be giving their evidence, even if it stood wholly uncontroverted in any material respect, a much greater force than it is justly entitled to, to declare that it established the fact on which the complainant's right to relief rests.

But the defendants controvert the case made by the complainant at all these points. They have offered evidence showing, according to the observations and recollection of their witnesses, that since the dam was lowered there is no more water at any of these points, when the stream is unaffected by exceptional causes, than existed there for a long series of years prior to 1876. The evidence of two of them is, in my judgment, of the most important character. One of them says, in 1860 he carted logs for the complainant for about a dozen days, extending over a period of four or five months, and that in crossing the ford in the morning, before the mill started, when the pond was full, the water would be two and half feet deep, coming up to the bellies of his horses, but after the mill started, the water would run down, and when he made the second crossing there would be much less water on the ford. He also says that the southerly line of the pond, at that time, when the pond was full, was from eight to twelve feet south of the ford. The other says that he crossed the ford over thirty years ago, for the purpose of carting logs, and that at that time the water on the ford, when he went over in the early part of the day, was so deep that it came over the front bolster of his wagon, showing a depth of quite three feet, and that when he returned the water would be so far drawn down that he could

cross the ford on foot, by stepping from the top of one stone to another. He also says that the southerly line of the pond, at that time extended beyond the ford. Other witnesses testify to many other facts leading, with more or less directness, to the same general conclusion. Special allusion has been made to the evidence of the two because of the high value which I think their evidence possesses. The facts they state show, with great distinctness, the remarkable changes which daily occurred in the condition of the water at the ford from ordinary causes, and thus making it easy to explain, without impugning the integrity of any of the witnesses, how it has happened that such a wide divergence exists in the evidence on this branch of the case.

This stream and pond are both small, and the volume of water in each is, in consequence, liable to be very greatly varied by very trifling causes. A single heavy shower will fill the stream, and make it very turbulent, and send so much water into the pond that to save the dam the floodgates must be hoisted; while running the mill for a few hours, when the pond is full, will draw the water down far below the top of the dam. Prior to 1876 the mill was only run in the day-time; no water was used at night, and the reason it was not was that a sufficient supply might be collected at night for the next day. The defendants now only use the water for three or four hours out of each twenty-four. The complainant himself says that he has known the volume of water running at the ford, in a dry time, to be increased from one or two inches to six inches, and perhaps more, by the mill immediately above being started; and one of his witnesses, who swore he had been familiar with the condition of the water at the ford for over forty-five years, said that he had known the water at the ford to be increased, by the same cause, from two or three inches to a foot. It is evident, therefore, that it is impossible, in consequence of the variable character of this stream, to fix with precision, or within a few inches, the elevation at which the defendants have a right to maintain their dam, by evidence consisting merely of the recollection of witnesses as to the quantity of water existing at a particular locality at one time as contrasted with the quantity found

there at another time. The quantity, it appears, varied widely, not only with the season, but daily, and almost hourly, and the variation was irregular; when the mill above was running, the operation of the mill below would draw down the water of the pond much less rapidly and quickly than it would when the upper mill was standing still; so that a person being at a particular place on the pond at one hour in the day would necessarily adopt a very different standard for the usual height of the water there from that which another person, who happened there at a different hour, would adopt as his standard. Besides, the picture remaining before an ordinary memory of what was seen casually, though frequently, as long ago as fifteen or twenty years, can rarely be implicitly relied upon as a safe guide in determining anything so vague and shifting as the usual height of the water of a stream or pond at a particular place.

Just in this connection it is important to state that the defendants applied to the complainant, while they were building the dam of 1876, for information as to its rightful height, and that he, after going to the dam and viewing it, told them he could not tell them, because he did not know. It is not pretended that he made this answer because he did not want to commit himself, or from a mere spirit of churlishness. He says that his answer was sincere and truthful. And yet it is undeniable that all the means then existed for determining the true height of the dam—and were well known to the complainant—which he has since attempted to use to show that the dam, as it now exists, is too high. But one deduction can be made from this conduct: the complainant did not then regard the facts upon which he now relies as furnishing trustworthy evidence of the rightful height of the dam.

There is evidence in the case, however, which is sufficiently certain and definite to enable the court to reach an entirely satisfactory conclusion on the question presented for judgment. The witnesses on both sides are agreed that a part of the dam of 1846 was standing, intact, in the fall of 1876. I refer now more particularly to the west end of the eastern part of the dam, where pieces of timber laid, supported by upright braces. And

there is proof on the part of the defendants, which is uncontra-
dicted, that these pieces of timber and braces were still there in
their original position as late as September, 1883.   The witness
who gives this evidence testified on the trial at law on the call
of the complainant, and here on the call of the defendants.   He
now says, after he had given evidence on the trial at law and
while the trial was still in progress, that, for the purpose of
satisfying himself that the evidence he had already given was
accurate, he made a further examination of the dam by making
measurements and taking levels, and that at that time he saw
these pieces of timber, and observed that they were still in their
original position, and made measurements from them for the
purpose of ascertaining how much higher the dam then in exist-
ence was than the dam of 1846.   He was afterwards recalled
on the trial at law, and then gave in evidence the result of his
re-examination of the dam, in confirmation of his previous testi-
mony.   His evidence, taken in connection with the evidence
of other witnesses, who have given testimony respecting the
continued existence of these and other remnants of the dam of
1846, shows that, when the defendants lowered their dam in
May, 1884, enough of the dam of 1846 still remained, at its
original elevation and substantially unchanged, to enable the
court to fix the height at which the defendants have a right to
maintain a dam there, with reasonable, if not absolute, certainty.

This witness says that the piece of timber lying on the top of
the west end of the eastern part of the dam, and resting in the
mortises of the upright braces, constituted a part of the lip of the
dam of 1846, and marked, in part, the efficient height of that
dam, the water, when the pond was full, first escaping over this
lip.   The defendants, in lowering their dam, adopted the standard
furnished by the testimony of this witness, and reduced the dam
in conformity thereto.   The reduction was made under his direc-
tion, and in conformity to measurements made by him.   If his
testimony is true, the dam is now no higher than it should be, and
the complainant has already had, by the act of the defendants
themselves, all the relief he is entitled to.   This witness, as already
stated, was called on the trial of the action at law to give evidence

against the defendants, and then testified that the dam erected by the defendants was higher than the dam of 1846, and stated how and why he knew that to be the fact. He also designated the extent of the excess. His testimony is of the kind that produces conviction. His evidence in this case exhibits a more thorough, complete and exact knowledge of the several dams which have existed at the place in question, since 1845, than that of any other witness. Indeed, he is the only witness called by either party whose recollection of the dam of 1846 continues, after this great lapse of time, so distinct and perfect that he is able to give a full and clear description of it, delineating not only how its several parts were constructed, and of what material they were made, but also their relative elevations. He is unquestionably a careful and intelligent observer, and endowed with a remarkably retentive memory. His demeanor on the witness-stand satisfied me that he is a just and truthful man. He seems to be prudent in judgment and cautious in his speech. In giving his evidence, I believe that he uttered nothing that he was not fully persuaded was the truth. I think he meant to declare the whole truth, concealing nothing and exaggerating nothing. I am thoroughly convinced of the substantial truth of his testimony. I think the defendants were therefore entirely justified, in the situation in which they were placed, being strangers to the locality and without personal knowledge of the height of any of the previous dams, and with no means of fixing the true height of their dam except those furnished by the evidence produced on the trial at law, in adopting the standard of height furnished by the testimony of this witness. It is undoubtedly true that if the dam is still too high, the mere fact that the defendants reduced it according to the standard fixed by this witness, will give them no right to the excess, but it shows, I think, that they have acted in good faith and with a sincere desire to respect the just rights of the complainant.

But the accuracy of the testimony of this witness in its most important particular is disputed. He says, it will be remembered, that the piece of timber lying on the west end of the eastern part of the dam marked the efficient height of the dam of 1846,

McConnell v. American Bronze Powder Manufacturing Co.

being one of the lowest points of that dam. His testimony in this respect, it is contended, is incorrect. And it is true that a number of witnesses, some called by the complainant and others by the defendants, have testified that according to their recollection, the point which this witness designated as the lowest part of the dam, or as low as any, was not the lowest, but was higher than certain other parts. They say that the dam, according to their recollection, was lowest in the middle, where the floodgates were, and at its eastern extremity, the dam, at these two points, being on the same level and lower than it was anywhere else. There is entire uniformity in the recollection of the witnesses who testify in this wise, that when the pond was full, the water escaped from it, either over the extreme eastern end of the dam, or around the east end of the dam, as soon as it did in the middle or at any other point, their recollection being that the middle of the dam and the east end of it were on the same level. Now, the proof is clear and undisputed that a waste-board was placed at the extreme east end of the dam a great many years ago, to serve as an outlet or waste-way when the pond was full. That board, according to the testimony of one of the complainant's witnesses, who says he assisted in putting it in its place, still remained in its place, at its original elevation, at the time this cause was heard, as firm and as solid as it was the day it was put there. The fact is undisputed that a level taken from this board shows that the defendants' dam, as it now stands, is nearly an inch lower than the top of this board. So it is manifest that whether the one criterion or the other, for settling the true height of the dam, be adopted, the result reached must be exactly the same. A careful consideration of that part of the evidence which, in my judgment, is sufficiently certain and definite to be fit to serve as a guide to the judgment, has led my mind to a very strong conviction that the dam, as it now stands, is no higher than the defendants have a right to maintain it, and consequently that the complainant is not entitled to the relief he seeks.

When the complainant filed his bill he had a good cause of action. That fact is beyond dispute. The judgment at law established it and the defendants' subsequent act in lowering their

dam admitted it. There can be no doubt, therefore, that the complainant is entitled to recover the costs of his suit up to the time the dam was lowered, and it would seem to be equally clear that since then the defendants are entitled to recover the costs of their defence. The decree to be made should, I think, therefore, declare that the complainant, at the time he brought his suit, had a good cause of action against the defendants, and was then entitled to a decree adjudging that the defendants' dam should be lowered, but it appearing that the defendants had, before answering, reduced their dam to its lawful height, the complainant is not now entitled to any relief in this suit, except that the defendants pay him the taxed costs incurred by him in his suit up to the time that they filed their answer, and that the taxed costs incurred by the defendants in their defence, since then, should be paid by the complainant.